UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X
ROBERT STEVENS,

               Plaintiff,                                 09-CIV-5237 (CM)

   - against -                                    **AFFIDAVIT IN**
                                                        **OPPOSITION**

THE STATE OF NEW YORK, et al.,

               Defendants.
--------------------------------------------------------X
STATE OF NEW YORK)
COUNTY OF KINGS    )

      **ROBERT STEVENS**, being duly sworn, deposes and says:

1. I am the plaintiff in the above-captioned action, and as such I am fully familiar with the facts and circumstanced set forth herein.

2. I make this affidavit in opposition to defendants' motion for summary judgment. The sworn facts contained herein shall serve to supplement and/or clarify those testified to during my deposition, and provide the court with the relevant facts it needs to make a determination in this matter.

## BACKGROUND

3. On May 3, 2007 I was hired by the Office of the State Comptroller ("OSC") as a State Program Examiner Trainee. I was selected off of a civil service list after scoring a 100 percent on the exam. My role entailed participating in the audits of government entities for the purpose of improving operations and making recommendations to save tax payer monies and prevent waste.

4. I am a white male

### From Hiring until First Termination

1

5. Initially, I was placed within Audit Area 4, which covers prisons and transportation agencies. From May 3, 2007 (the date I commenced my employment with OSC) through August 2007, I was assigned to audits of public authorities. Among the authorities audited were the N.Y.C. Municipal Water Authority, the N.Y.C. Transitional Finance Authority ("TFA"), and N.Y.C. Housing Development Corporation (N.Y.C H.D.C).

6. I never had any issue with tardiness or absence during this period of time. Additionally, I produced solid findings on my audit reports including commingling of funds between to two authorities (MWFA and TFA), and a lack of statutorily required training of all Board members. In fact, my audit work was so strong that for a period of time I was allowed to conduct the N.Y.C H.D.C. audit alone while my Examiner-in-Charge was on vacation. Management expressed confidence in my reliability, dependability, and performance.

7. My employee evaluations for my first three assignments were flawless, containing no negative marks or comments whatsoever. Of particular relevance to, my rating in the areas of interpersonal skills and ability to get a long was "meets expectations".

8. In August 2007 I received a call from Area 4 Audit Manager Robert Mehroff informing me that I would be replacing another auditor trainee at an audit already in progress at Green Haven Correctional Facility in Stormville, New York. Mr. Mehroff further informed me that the audit I would be working on is considered a "travel audit", and thus the office would put me up in a hotel.

I then asked Mr. Mehroff what the travel arrangements would be for me to get to/from the audit site, and he replied that the office would pay for me to rent a car and I should drive from my home in Bay Ridge to the audit location in Stormville. It is important to note that at no time during the hiring process was I asked about my driving ability or in any way told that driving long distances (or driving at all, for that matter) would be a requirement of the job. In fact, I did not even possess a driver's license at the time I took the entry level exam.

9. I was immediately apprehensive and voiced my concerns to Mr. Mehroff. I explained to him that I lacked driving experience and that traveling all that distance by car could literally put my life in danger as well as the lives and safety of other motorists. I lived in Brooklyn my entire life and have never owned a car, nor did my parents ever own a car. My driving experience was limited to driving lessons on local streets with an instructor seated beside me. I had never even driven on a highway before.

10. Despite all of this, Mr. Mehroff insisted that I take the assignment and travel upstate by car. At that point I told him directly that I would inevitably be late throughout the assignment, if not injured in a motor vehicle accident. Mr. Mehroff again ignored my concerns. These conversations are memorialized in e-mails.

11. At the end of August 2007, I began my fearful attempt to reach the prison facility. As I predicted, I had major problems driving. When I picked up the rental car at a local Enterprise, I had difficulty even pulling the car out of the

lot. On my highway trip I missed several exits due to my inexperience and slow driving to avert any accidents. Several times I nearly collided into vehicles as they sped by mine.

12. I contacted Bruce Brimmer (who was a senior auditor at the Green Haven job) to inform him that I was lost and afraid on the highway, and I asked to speak to Ms. Boyer who was the E.I.C. (Examiner-in-Charge) on the assignment. When I finally reached Ms. Boyer, her tone was agitated and she seemed angry. I explained to her the reason for my delay, even detailing for her my limited driving experience. Ms. Boyer, clearly annoyed, gave me driving directions from where I was. I arrived at the facility sometime during the work shift that day. The drive was a very stressful and trying endeavor for me and I feel very fortunate that I was not in an accident; I was petrified.

13. Later when my later arrival at the facility was called into question, I responded in a manner I thought was appropriate. I was under an extreme amount of stress, and I was also frustrated because I was being chastised as a result of a problem that I foresaw and advised my supervisors about in advance. I was never disrespectful nor was I displaying an attitude toward Erica Zawrotniak or Boyer. I civilly explained to them my circumstances, but they were not at all receptive and responded to my concerns with a care-free attitude. I told them this will be a continuing problem as I did not feel comfortable driving at all.

14. Arrangements were made for me to take a train to Beacon, New York (which was a town closer to the audit site but still required me to drive some

4

distance), and from there rent a vehicle and continue on to Green Haven. This was better than driving from Brooklyn, I suppose, but it still did not remedy the problem. I did not feel comfortable on the road at all. I still had to drive on the highway, still drove slowly and missed exits, causing me to be late to the audit site again. I arrived on time in Beacon, but was delayed in driving.

15. I guess it is difficult for people who drive regularly just how uncomfortable I was, but I was extremely fearful on the road. I did not want to be late, but I drove slowly because it was the best way I knew how to avoid injury to myself or others. I had the same difficulty when driving from the audit site to the hotel. I arrived late to the hotel, cutting into my own free time and sleep time. The same was true when I drove home to Brooklyn on Fridays. I was delayed in my arrival there. I think the consistent lateness in relation to the job, no matter what my destination, should support the fact that my lateness was attributable to my lack of driving experience and not that I simply did not value the importance of arriving to work on time, which is what my employers are insinuating.

16. Throughout my assignment at Green Haven, Ms. Boyer harassed me about the lateness. I tried to no avail to explain to her that I was having extreme difficulty with the drive. She had a cold attitude towards me and would not train me to perform payroll auditing (someone else showed me what to do when Ms. Boyer was not on the job).

17. On September 19, 2007, I was summoned to the N.Y.C. office to speak with Robert Mehroff and Erica Zawrotniak concerning the lateness matter. During

5

the meeting I articulated my position in a matter-of-fact fashion, but never became argumentative as defendants allege, nor did I reject OSC travel polices. I discussed only my own situation and, in my own defense, said that I advised OSC that these problems would occur and I was sent on the audit in spite of that, and was being penalized because exactly what I predicted would occur, did occur. I did not and do not think that was fair. I asked for my vacation time, which was charged due to my lateness, to be credited back to me. That request was denied and I was instructed to remain on the Green Haven audit and directed simply to be on time, without any regard whatsoever for the cause for my tardiness.

18. At the conclusion of the meeting I proceeded to Green Haven. When I arrived I rushed into the facility in an effort to get to work immediately. When I started at Green Haven, Ms. Boyer informed me of a restriction of cellular phones but never mentioned other restricted devices. However, just to be cautious I typically left all electronic devices in the car before entering the facility. In my haste, however, I inadvertently passed through security with my IPOD in my pocket.

19. Ms. Boyer accused me of trying to bring a cell phone into the facility. I told her it was an IPOD but she would not listen to my explanation.

### Forced Resignation and Termination

20. I was subsequently confronted about the cell phone by Zawrotniak and given an on-the-spot ultimatum: resign or be terminated. I asked to consult with an attorney or a union representative and my request were denied. I was told I

could not leave the room or use my phone. I was compelled to forcibly resign due to the threat of the stigma associated with termination.

21. Upon leaving the office that day I encountered John Lang, an E.I.C. who is also the Public Employee Federation Union Steward for the O.S.C.. I requested the Union work on my behalf to overturn my termination. Mr. Lang agreed to assist me after learning of all the facts. Mr. Lang and P.E.F. officers contacted Jerry Barber, the Assistant Comptroller of the Audit Bureau, and Lynn Canton, the Deputy Comptroller of the Audit Bureau. After viewing the evidence that I did not bring a cell phone to the prison and that I informed Mehroff in advance of my limited driving record, the OSC overturned my termination. I was told by many people that it is very rare for a trainee to be reinstated. My final evaluation prior to termination was edited, and Jerry Barber even had me brought to Albany (all expenses paid) to personally apologize to me for the whole ordeal. During this same meeting, Robert Blot, Director of Administration and Martin Chauvin, Manager of the Professional Development Unit, also apologized.

### Commencement in Area 2 and Grand Concourse Audit

22. Upon my reinstatement, I was assigned to Audit Area 2. Within Area 2 I solely audited charter schools. My first assignment was at Grand Concourse Charter School beginning October 2007 and continuing through December 2007. My supervisor was Stephen Lynch, the E.I.C. was Dan Racyinski, and my co-trainee auditor was Ryan Wendowloski. During this assignment, knowing my history with OSC, Racyinski remarked that he agreed with

7

previous E.I.C. Boyer's assessment of my performance. Besides the hostility from the E.I.C., Mr. Wendolowski did not like me and told me "this is why no one in the office likes you". I also learned during the course of that audit that Wendolowski and Racynski were former college roommates and that Racyinski assisted him in obtaining the job as a State Program Examiner Trainee.

23. At the conclusion of this audit, Mr. Racyinski was required to complete a new hire skills matrix which evaluates a trainee on their performance on that particular audit. Mr. Racyinski rated me poorly on this matrix in the area of interpersonal skills. I believe this was based on a disagreement I had with Wendolowski, which is unfair since sometimes people disagree and Racynski favored Wendolowski because they were old friends. I appealed this rating to Mr. Stephen Lynch, Audit Supervisor. I never threatened to sue Mr. Lynch. Mr. Lynch initially denied my request to amend the matrix rating. I then appealed to Jerry Barber and presented the facts that Wendolowski and Raycinski were college roommates and, thus, Raycinski could not fairly evaluate me after I had a disagreement with Wendolowski. Mr. Barber edited the matrix.

### Bronx Charter School for the Arts Audit & One Year Evaluation

24. From January 2008 through April 14th 2008 I was assigned to the Bronx Charter School for the Arts. My E.I.C on this job was Marc Geller. I excelled on this audit. My findings were substantial. I discovered a violation of competitive bidding rules at the school in which the Principal hired her spouse

8

for a contract without seeking bids for the most reasonable price. In addition, I found inappropriate purchases of IPods, an instance where a teacher paid a personal parking ticket on the taxpayer's expense, and $53,000.00 in unsupported credit card disbursements. Finally, I found that the school was paying teachers with meals for overtime pay as opposed to time and a half compensation.

25. My matrix ratings on this audit for interpersonal skills (i.e., works effectively with management and team members) were "substantially exceeds expectations". This rating was given by Mr. Geller, Mr. Lynch, and Kenrick Sifontes. In the comment section of the matrix, it reads: "Robert has been able to develop an excellent rapport with the field team members, auditee personnel and supervision." At the closing conference for this audit, the chairwoman of the board directly told Lynch and Sifontes and Geller that I "earned my salary" on this assignment.

26. In March 2008, I was the recipient of an Employee Recognition Award for my contribution to Charter School audits. Mr. Lynch nominated me for this award.

27. All of the foregoing flies in the face of defendants' reasons for my termination as stated herein. The comments and accolades counter the allegation that I was terminated for insubordination and inability to get along with others.